UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

GLADSTONE TAYLOR, individually and on behalf of
of all others similarly situated,

                              Plaintiff,

               -against-

MICROGENICS CORPORATION, THERMO FISHER
SCIENTIFIC, CORRECTION OFFICER BERRY, in
his individual capacity, CORRECTION OFFICER
BRANDON, in his individual capacity, CORRECTION
OFFICER S., in his individual capacity,
OFFENDER REHABILITATION COORDINATOR
D.A. GLOVER, in his individual capacity, CORRECTION
OFFICER HERNANDEZ, in his individual capacity,
CORRECTION OFFICER HILTON, in his individual
capacity, CORRECTION OFFICER ICARRI, in her
individual capacity, EDUCATIONAL SUPERVISOR
MULLIGAN, in her individual capacity, CORRECTION
OFFICER RUBIO, in his individual capacity,
CORRECTION OFFICER WU, in his individual
capacity, CORRECTION OFFICERS DOE ONE-TEN,
representing as yet unknown and unidentified members
of the Fishkill Correctional Facility,

                            Defendants.

--------------------------------------------------------------------X

**DOCKET NO.: CV-21-6452**

**<u>COMPLAINT</u>**

**<u>JURY TRIAL DEMANDED</u>**

      **PLAINTIFF, GLADSTONE TAYLOR,** by and through his attorneys, the LAW OFFICES

OF FREDERICK K. BREWINGTON, as and for his Complaint against the Defendants, states and

alleges as follows:

### <u>PRELIMINARY STATEMENT</u>

      1.     This is a civil action seeking monetary relief (including past and ongoing economic

loss), injunctive relief, declaratory judgment, compensatory and punitive damages, disbursements,

costs and fees for violations of the Plaintiff's rights, brought pursuant to 42 U.S.C. §§ 1983 and 1988.

This is also an action based on Defendants' negligence and false imprisonment of Plaintiff,  which

is brought on behalf of Gladstone Taylor, who was unjustly punished for a false positive drug test result in January 2020.

2.      Defendant THERMO FISHER SCIENTIFIC (hereinafter "THERMO FISHER"), doing business as  Microgenics Corporation (hereinafter "MICROGENICS"),  is the company with which the New York Department of Corrections and Community Supervision (hereinafter "DOCCS")  contracted to provide, install, maintain, and train DOCCS employees on urinalysis analyzers used to conduct inmate drug testing at all 52 DOCCS facilities.

3.      MICROGENICS was required to ensure that the urinalysis analyzers were used in accordance with applicable standards and produced accurate results. Due to their negligent failure to fulfill this basic responsibility, thousands of individuals incarcerated in New York State prisons received positive drug test results from 2019 to 2020 even though they did not ingest any illicit substance.

4.      When MICROGENICS entered into a contract with DOCCS, MICROGENICS knew that DOCCS would use positive drug tests to discipline individuals in DOCCS' custody, and that is in fact what DOCCS did. Relying on false positive results generated by MICROGENICS urinalysis machines, DOCCS charged Plaintiff severely for drug use. Additionally, Plaintiff was removed from a Temporary Work-Release program, moved back to the general population area of prison and incarcerated beyond his original release date as a direct result of the false positive drug test.

5.      The punishments Defendants GLOVER, MULLIGAN and OFFICER DOE levied against Plaintiff for false positives results were devastating for Plaintiff, who had done nothing wrong and was bewildered by the false accusation.

6.      These punishments include, but were not limited to, removal from a work-release

2

program, weeks in cube confinements, lost of privileges, denial of visitation, and rescission of his release date.

7.        MICROGENICS and THERMO FISHER are liable to Plaintiff, who was formerly incarcerated in New York State and received a false positive drug test result due to their negligent failure to ensure that their drug testing devices and assays were used in accordance with applicable standards and produced reliable results.

## JURISDICTION AND VENUE

8.        The jurisdiction of this Court is invoked under  28 U.S.C. §§ 1331 and 1343. This action involves a federal question  because the action is based on a violation of a federal statute, 42 U.S.C. § 1983.

9.        Venue in the Southern District of New York is proper under 28 U.S.C. §1391 based on the fact that the place where the events and violations herein alleged occurred was in the County of Dutchess.

## PARTIES

10.        Plaintiff, Gladstone Taylor, is a 33 year old African American man who resides in Yonkers , New York.  From December 12, 2015 to March 26, 2020, Mr. Taylor was in the custody of DOCCS.

11.        At all times relevant hereto, Defendant MICROGENICS CORPORATION (hereinafter "MICROGENICS") was and is a Delaware company that is based in Fremont, California. MICROGENICS specializes in the development, manufacture, marketing and sale of products relating to clinical diagnostics. MICROGENICS is a wholly owned corporate subsidiary of Defendant THER MO FISHER SCIENTIFIC. In 2018, MICROGENICS contracted with DOCCS

3

to provide Indiko Plus urinalysis analyzers at 52 DOCCS locations, and to install, maintain, and train DOCCS employees on those machines.

12.     At all times relevant hereto, Defendant THERMO FISHER SCIENTIFIC (hereinafter "THERMO FISHER") was and is a Delaware company that is based in Waltham, Massachusetts. THERMO FISHER is the corporate parent company of MICROGENICS. THERMO  FISHER markets itself as the manufacturer of the Indiko Plus urinalysis analyzers, as well as the owner of the assays used to conduct drug testing on those machines. THERMO FISHER is responsible for all FDA submissions made regarding the Indiko Plus urinalysis analyzers and assays used to conduct drug testing on those machines. For purposes of the contract with DOCCS, MICROGENICS is identified as doing business as THERMO FISHER.

13.     At all times relevant hereto, upon information and belief, Defendant BERRY (hereinafter "BERRY"), sued here in his individual capacity, was and is an employee under the direction of Fishkill Correctional Facility. At all times relevant hereto, BERRY was and is a state actor. Defendant Berry's first name has not been discovered yet by Plaintiff.

14.     At all times relevant hereto, upon information and belief, Defendant BRANDON (hereinafter "BRANDON"), sued here in his individual capacity, was and is an employee under the direction of Fishkill Correctional Facility. At all times relevant hereto, BRANDON was and is a state actor. Defendant Brandon's first name has not been discovered yet by Plaintiff.

15.     At all times relevant hereto, upon information and belief, Defendant S. (hereinafter "S."), sued here in his individual capacity, was and is an employee under the direction of Fishkill Correctional Facility. At all times relevant hereto, S. was and is a state actor. Defendant S.'s full name has not been discovered yet by Plaintiff.

16.     At all times relevant hereto, upon information and belief, Defendant D.A. GLOVER (hereinafter "GLOVER"), sued here in his individual capacity, was and is an employee under the direction of Fishkill Correctional Facility. At all times relevant hereto, GLOVER was and is a state actor. Defendant Glover's first name has not been discovered yet by Plaintiff.

17.     At all times relevant hereto, upon information and belief, Defendant HERNANDEZ (hereinafter "HERNANDEZ"), sued here in his individual capacity, was and is an employee under the direction of Fishkill Correctional Facility. At all times relevant hereto, HERNANDEZ was and is a state actor. Defendant Hernandez's first name has not been discovered yet by Plaintiff.

18.     At all times relevant hereto, upon information and belief, Defendant HILTON (hereinafter "HILTON"), sued here in his individual capacity, was and is an employee under the direction of Fishkill Correctional Facility. At all times relevant hereto, HILTON was and is a state actor. Defendant Hilton's first name has not been discovered yet by Plaintiff.

19.     At all times relevant hereto, upon information and belief, Defendant ICARRI (hereinafter "ICARRI"), sued here in his individual capacity, was and is an employee under the direction of Fishkill Correctional Facility. At all times relevant hereto, ICARRI was and is a state actor. Defendant Icarri's first name has not been discovered yet by Plaintiff.

20.     At all times relevant hereto, and upon information and belief, Defendant MULLIGAN (hereinafter "MULLIGAN"), sued here in her individual capacity, was and is an employee under the direction of Fishkill Correctional Facility. At all times relevant hereto, MULLIGAN was and is a state actor. Defendant Mulligan's first name has not been discovered yet by Plaintiff.

21.     At all times relevant hereto, upon information and belief, Defendant RUBIO

5

(hereinafter "RUBIO"), sued here in his individual capacity, was and is an employee under the direction of Fishkill Correctional Facility. At all times relevant hereto, RUBIO was and is a state actor. Defendant Rubio's first name has not been discovered yet by Plaintiff.

22.     At all times relevant hereto, upon information and belief, Defendant WU (hereinafter "WU"), sued here in his individual capacity, was and is an employee under the direction of Fishkill Correctional Facility. At all times relevant hereto, WU was and is a state actor. Defendant Wu's first name has not been discovered yet by Plaintiff.

23.     At all times relevant hereto, Defendants OFFICERS DOE ONE-TEN (hereinafter "DOES"), sued here in their individual capacities, were and are employees of Fishkill Correctional Facility.  The name DOES is fictitious, and the true names are unknown to Plaintiff. The persons intended are unnamed Correction Officers of DOCCS who participated in incarcerating Plaintiff on the basis of a faulty drug test. At all times relevant hereto, DOES were and are state actors.

## STATEMENT OF FACTS

***Thermo Fisher and Microgenics Enter into a Contract with DOCCS to Provide IPUA Urinalysis in Compliance with State Regulations which Require a Second Confirmatory Test.***

24.     Thermo Fisher manufactures and markets drug-testing machines known as Indiko Plus urinalysis analyzers (hereinafter "IPUA") and assays or reagents used with those machines to test a person's urine for illicit substances. The IPUA functions as follows: a person's urine is mixed with reagents, the IPUA interprets the reaction for the presence or absence of illicit substances such as buprenorphine, synthetic cannibinoids, opiates and tetrahydrocannabinol ("THC") according to the cutoff detection levels specific to those substances as predetermined by DOCCS and/or the United States Substance Abuse and Mental Health Services Administration (hereinafter

6

"SAMHSA").

25.     Thermo Fisher is responsible for all Federal Drug Administration ("FDA") submissions relating to IPUA machines and assays.

26.     Thermo Fisher is the parent company to and wholly owns Microgenics. Microgenics specializes in the development, manufacture, marketing and sale of products relating to clinical diagnostics. Microgenics is among various medical distributors of Defendant Thermo Fisher's IPUA across the United States.

27.     Pursuant to Thermo Fisher and Microgenics' own standards as the manufacturers of IPUA machines and products, the accuracy of any positive drug test results obtained through IPUA urinalysis is to be verified by a confirmatory test using gas chromatography or some other method. This standard is in place in order to eliminate a urinalysis test risk of false positives due to reagents' cross-reactivity potential, which refers to when reagents are triggered by lawful medications or other non-illicit substances in urine.

28.     Consistent with Thermo Fisher and Microgenics' own manufacturer standards that require confirmatory testing to verify any positive result obtained by their IPUA urinalysis, DOCCS has known for nearly 40 years that immunoassay manufacturers recommend that positive urinalysis drug-screen results be confirmed by an alternative scientific method, such as gas chromatography-mass spectrometry. Assuming that a urinalysis screen is generally reliable, the confirmatory-test recommendation is meant to minimize any false-positive margin of error, however small, inherent in relying on urinalysis testing alone.

29.     At all relevant times, DOCCS' inmate urinalysis testing has employed reagent test urinalysis scans (also known as the "immunoassay" method) alone without confirmatory testing "to

verify whether or not an inmate has used drugs.

30.     Evidence that DOCCS has intentionally elected not to make confirmatory testing a part of its inmate urinalysis program is the fact that DOCCS has made a different choice as to other drug testing programs, such as DOCCS' parolee and employee drug testing programs.

31.     According to New York regulations, at the time an inmate's urine is collected, all DOCCS personnel handling the specimen must be identified on a DOCCS chain of custody form and inquiry must be made as to whether the inmate "has been taking any medication in the past month." *N.Y. Comp. Codes R. & Regs. tit. 7 § 1020.4(d)(2)*. If a positive result is obtained on the first test, then a second test shall be performed on the same sample. *N.Y. Comp. Codes R. Regs. tit. 7 § 1020.4(f)(1)(iv)*. If a positive result is obtained from the second test, the individual performing the urinalysis testing shall cause a misbehavior report to be issued. *Id.* Prior to imposing discipline upon an inmate for drug use based on test results, DOCCS holds a disciplinary hearing. *N.Y. Comp. Codes R. Regs. tit. 7 § 253.6.* At such a hearing, the inmate has the right to submit evidence and challenge the drug screen procedures. *N.Y. Comp. Codes R. & Regs. tit. 7 § 253.6(c).*

32.     In 2018, DOCCS issued an Invitation for Bids No. 2018-06 (hereinafter "IFB") seeking to award a contract for the provision of urinalysis machines and products as well as training, support, maintenance and testimony services. The IFB required that all bidders agree to adhere to all federal and state laws and regulations in providing these products and services pursuant to any contract awarded.

33.     Microgenics submitted a bid in response to DOCCS' IFB representing that it was willing and able to meet all of the IFB's specifications. While negotiating a contract with DOCCS, Microgenics knew but did not disclose to DOCCS that Microgenics' standards for the IPUA as its

8

manufacturer state that the machines should be used as an initial screen only, with an outside laboratory's confirmatory testing using gas chromatography or another method required to verify a reliable positive result. At the time of the bid and contract negotiation process, Microgenics and Thermo Fisher's own standards as IPUA's manufacturers were to recommend that it be used as an initial drug screen only, and that any positive result should be verified by a confirmatory test such as gas chromatography or another method to ensure its accuracy and reliability. Microgenics and Thermo Fisher failed to inform DOCCS of this at the time of their bid submission or contract negotiation.

34.     In June 2018, DOCCS awarded Microgenics Contract No. CC1614458 in connection with the DOCCS IFB and Microgenics' related bid. Contract No. CC1614458 comprised of the parties' original June 2018 Agreement and a later October 2018 Agreement Amendment that were then together approved by the Comptroller of the State of New York (hereinafter known as the "Contract"). The Contract required Microgenics to satisfy the DOCCS' IFB requirements as discussed. In the event that Microgenics failed to comply with the terms and conditions of the Contract and/or with any laws, rules, regulations, policies or procedures affecting the Contract, the Contract gave DOCCS the right to terminate the Contract for cause immediately upon written notice to Microgenics.

35.     Thermo Fisher and Microgenics began providing their platform of IPUA machines, products and services to DOCCS in late 2018 or early 2019. Microgenics and Thermo Fisher's own manufacturers' standards were that IPUA positive screens should be verified by a confirmatory test such as gas chromatography to ensure its accuracy and reliability, but Microgenics and Thermo Fisher did not disclose this requirement as part of their training, support or testimony services.

36.     In Thermo Fisher and Microgenics' provision of their platform of IPUA machines, products and services for DOCCS' inmate urinalysis testing, they became aware that the IPUA had a cross-reactivity issue, meaning that the system falsely reported innocent substances in urine as illicit substances, after inmates began to report an atypically high numbers of false IPUA positive scans. Thermo Fisher and Microgenics unreasonably failed to take corrective action to ensure that their products and services were used in accordance with applicable standards even though their manufacturing, training, support, maintenance and testimonial roles put them in full control over the nature of their use. Thermo Fisher and Microgenics knowingly allowed inmates to be disciplined on the basis of positive IPUA scans without disclosing that the test was suffering cross-reactivity issues such that DOCCS' understanding about its accuracy and reliability had been compromised.

37.     DOCCS ultimately determined that the cross-reactivity issues made positive results generated by IPUA so unreliable that it later reversed every inmate disciplinary decision that had been based upon positive buprenorphine, synthetic cannabinoid, opiate and THC urine scans reported by IPUA urinalysis in 2019.

38.     In January 2020, DOCCS terminated its contract with Thermo Fisher and Microgenics for cause, based on their failure to comply with the terms and conditions of the DOCCS Contract.

39.     In February 2020, the State of New York commenced a lawsuit against Thermo Fisher and Microgenics in New York State Supreme Court.

40.     The testing failures have also given rise to DOCCS and New York State Inspector General investigations.

***Plaintiff Gladstone Taylor Received a False Positive Result on an IPUA Urinalysis that was Known by Defendants to Yield False Results and was Denied A Second Confirmatory Test.***

41.       Plaintiff was arrested on December 12, 2015, and admitted into Downstate Correctional Facility (hereinafter "Downstate") on December 1, 2016. From December 1, 2016 to December 17, 2017, Plaintiff was incarcerated at the Downstate facility.

42.       Then, Plaintiff was transferred to Mid-State Correctional Facility (hereinafter "Mid-State") from December 17, 2017 through December 24, 2018.

43.       Plaintiff was then transferred to Marcy Correctional Facility (hereinafter "Marcy") from December 24, 2018 until June 26, 2019. At Marcy, Mr. Taylor participated in, and graduated from the Alcohol and Substance Abuse Treatment (hereinafter "ASAT") program.

44.       After, Plaintiff was incarcerated at Fishkill Correctional Facility (hereinafter "Fishkill"), a DOCCS facility, from June 26, 2019 until March 26, 2020.

45.       Throughout his incarceration at Mid-State, Marcy and Fishkill Correctional Facilities, Mr. Taylor was a model prisoner with an unblemished record of good behavior. While incarcerated, he participated in numerous prison programs, graduated from the ASAT substance abuse treatment program at Marcy Correctional Facility, and then became eligible for the work-release program at Fishkill Correctional Facility.

46.       As soon as Mr. Taylor was eligible, Plaintiff applied for and was accepted into the Work-Release Program at Fishkill, on July 2, 2018, on the basis of his exemplary behavior.

47.       Beginning June 26, 2019, while in the custody of Fishkill, Plaintiff  participated in the 5-2 Temporary Work Release program in which he was permitted to live in his  home with his family five (5) days and four (4) nights each week. Plaintiff would then return to be incarcerated in

Fishkill for the remaining two (2) days each week. Plaintiff was permitted to leave Fishkill on Saturday mornings and was required to return to Fishkill on Thursday evenings. As part of the Work Release program, Plaintiff worked at a Wendy's restaurant in Elmsford, New York, on Sunday, Monday, Wednesday and Friday. Each Friday, Plaintiff would leave Fishkill and travel to Elmsford, New York to work his Friday shift at Wendy's and return to Fishkill in the evening.

48.     Additionally, as part of his admission into the Work-Release Program, Mr. Taylor was able to maintain his ties and connection with his community and gain a semblance of normalcy.

49.      On the two days a week on which Mr. Taylor remained at Fishkill during the evenings, he was able to live with a smaller group of men who were not felony offenders, and he no longer had to fear being attacked by serious offenders residing in the general population area of Fishkill. Additionally, Mr. Taylor was not confined to a narrow cell or cube, had more freedom, independence and autonomy, and had better access to a stove, showers and toilets.

50.     There were approximately twenty-one (21) other inmates in Fishkill's Work-Release program. Plaintiff lived in the residential area which was reserved for Work Release Program inmates. Because of this relatively low number of inmates, not only was Plaintiff and other program members given more access to open spaces than the other inmates, but every inmate was permitted to go home at some point during the week.

51.      The majority of the individuals in the 5-2 Temporary Work-Release program at Fishkill were respectful, followed the prison rules, and did not fight with other inmates or Correction Officers. Detainees were admitted into the program based on good behavior. As such, Plaintiff and other program members were committed to abiding by the program rules, and looked forward to being permanently released from Fishkill.

52.     As a requirement of participation in the Work-Release Program, Mr. Taylor was well-aware that all individuals participating in the Work Release program were required to submit drug testing.

53.     On the evening of January 9, 2020, Plaintiff was given an IPUA drug test by Defendant Officer Wu at Fishkill that was, upon information and belief, one of the faulty rapid urine drug tests manufactured by Microgenics. The following day, January 10, 2020, Plaintiff was permitted to leave Fishkill in order to go to work at Wendy's.

54.     On or about January 11, 2020, Plaintiff was informed by a Fishkill employee that there was a hold on his name. Because of the hold, Plaintiff was prevented from returning to his home as he normally would on a Saturday. Plaintiff was not provided with a reason or justification for the hold on his name at that time. On or about January 12, 2020, a Correction Officer informed Plaintiff that he was removed from the Work Release program and would be imprisoned full time because his dipstick urine test came back positive. Plaintiff was shocked to learn that he was being removed from the Work Release program because he did not consume any illicit drug or substance. Despite Plaintiff's previously exemplary behavior while incarcerated, and despite his protests to the contrary, Plaintiff was wrongfully removed from the Work Release program and denied the ability to reside in his home four nights each week before returning to Fishkill. This wrongful punishment occurred prior to the holding of a Superintendent's Hearing and prior to any official finding of guilt was determined. This wrongful punishment was executed while Microgenics and Thermo Fisher had full knowledge that the IPUA drug tests they were providing to DOCCS and Fishkill were wholly unreliable. Additionally, Plaintiff was terminated from his job at Wendy's, where he was being considered for promotion to management, because he was no longer permitted to leave the Fishkill

13

facility on Work Release due to Defendants providing an unreliable urinalysis drug test.

55.     Over the next several days, Plaintiff repeatedly expressed his concerns to Correction Officers and employees that a mistake had occurred. Plaintiff repeatedly asked for his urine to be retested because he knew that he did not consume any illegal drug, and believed that retesting his urine would vindicate him. However, in response to his requests, a Correction Officer informed Plaintiff that another Correction Officer "threw the urine out."

56.     On or about January 13, 2020, Defendant Officer Glover wrote an Inmate Misbehavior Report about the purported "positive" result of Plaintiff's urine drug test. Officer Glover's report stated that Plaintiff tested positive for opiates. Officer Glover asked Plaintiff whether he used any illegal drugs, to which Plaintiff vehemently denied usage of any illegal drug. Officer Hernandez escorted Plaintiff to his locker where he retrieved his Naproxen medicine bottle. The brand name of Naproxen is Aleve and it is used for pain and swelling. Officer Glover called the medical staff to inquire about Naproxen which informed him that Naproxen does not have any opiates. Defendant Officer Rubio was witness to Officer Glover's questions and inquiries. Nonetheless, Officer Glover's report falsely stated that Plaintiff told the officers that he was using Naproxen for pain and that the "opiates" in the Naproxen caused the positive result of the urine drug test. Plaintiff made no such statement to anyone at anytime.

57.     On or about January 13, 2020, as a result of his "positive" IPUA drug test, Plaintiff was officially issued a Tier III ticket. The Tier III ticket is reserved for the most serious infraction, and therefore Plaintiff was harshly punished.

58.     As a result of the "positive" IPUA drug test, Plaintiff lost several privileges and benefits including, but not limited to, removal from the Work Release program, loss of commissary,

and loss of visitation. These rights and privileges were revoked before any hearing was conducted.

59.     On or about January 22, 2020, Plaintiff was removed from the Work-Release housing section of Fishkill and transferred to the general population area of Fishkill. Plaintiff was placed in cube confinement under which he was not allowed to move from his assigned cube area without permission from a DOCCS Correction Officer. While in the general population area, Plaintiff was forced to interact with inmates who had been charged with and/or convicted of serious violent felonies. Plaintiff did not feel safe in general population housing where he lived in a large, crowded and open dormitory style room with approximately sixty (60) other men.

60.     Prior to entering the custody of Fishkill, Plaintiff suffered from Depression, Anxiety, and Schizophrenia. After being transferred to general population housing at Fishkill, Plaintiff's existing mental health issues were exacerbated. During the two months Plaintiff spent in the general population area, a man was stabbed while sleeping and multiple fights broke out that led to bloodshed. Plaintiff was put in a cell with an inmate who had not seen sunlight in thirty-three (33) years. Inmates in the general population area constantly discussed "who was getting stabbed that night." Plaintiff remained in constant fear of attack from the inmates in general population housing. These living conditions led to Plaintiff having extreme difficulty sleeping, and to experience extreme paranoia, nausea, severe migraines, insomnia, lack of motivation and hopelessness.

61.     Plaintiff was traumatized by his time in general population. Plaintiff was not only shocked that he received what he knew to be a false positive drug test result, he was also affected by his loss of freedom, loss of privileges including visitation and commissary, and he was negatively affected by knowing he was facing serious disciplinary actions including extended incarceration for an act he did not commit. Plaintiff was told by Correction Officers that "he was never going back

out," which led Claimant to sink into deeper depression and hopelessness.

62.    The adverse mental and emotional effects on Plaintiff resulting from the disciplinary disposition and the resulting sanctions imposed upon him cannot be overstated. Plaintiff worked tirelessly and successfully to become a model prisoner and get his life back on track. After receiving the false positive test result, being removed from the Work Release program, and losing many of his privileges, Plaintiff felt that his world was crashing down upon him. Plaintiff felt he had no control, because even though he did everything right, he was being severely punished. Plaintiff began feeling more and more helpless, and questioned why he was facing such unfair treatment when he had done nothing wrong and made constructive positive changes in his life.

63.    On January 29, 2020, Plaintiff finally had a hearing on the disciplinary charges issued against him for his "alleged" violations of drug use policies and Temporary Release program rules.

64.    Plaintiff's hearing on January 29, 2020 was led by Defendant Educational Supervisor Mulligan (hereinafter "Mulligan"). The hearing was not held with the participation or presence of a Lieutenant which, upon information and belief, is required by DOCCS procedures and regulations. Additionally, a Superintendent Hearing must occur within fourteen days of the writing of an Inmate Misbehavior report. However, the hearing did not occur within 14 days of Defendant Glover writing a misbehavior report regarding Plaintiff's "violations" of prison rules of conduct. Plaintiff received the Misbehavior Report on January 9, 2020. Plaintiff's Superintendent Hearing occurred twenty days later, on January 29, 2020, six days past the mandated time for conducting a Superintendent hearing and therefore a violation of DOCCS policies and regulations. Furthermore, Plaintiff was not informed that the Superintendent Hearing would be delayed. *N.Y. Comp. Codes R. & Regs. tit. 7 § 251-5.1,* which states in pertinent part: "[t]he disciplinary hearing or superintendent's hearing must

be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee"; *N.Y. Comp. Codes R. & Regs. tit. 7 § 251-5.1.*

65.     The Superintendent Hearing, which was led by Defendant Mulligan, was attended by Defendants Officer Icarri, Officer Hernandez, Officer Rubio, and Officer Glover. Defendant Glover threatened Plaintiff and told him that he would never go home if he did not plead guilty to the Tier III ticket. Furthermore, Defendant Mulligan pressured Plaintiff to plead guilty and stated to Plaintiff that he would be denied privileges if he contested the ticket, and that the odds of winning an appeal on the Tier III ticket were slim to none. Plaintiff was repeatedly told: "This is the last shot you have to tell the truth." However, the truth was that Plaintiff did not consume any illicit drugs. Thus, Plaintiff never pled guilty. Plaintiff also requested that his urine be retaken and re-tested.  However, Defendant Glover, and other Fishkill employees continued to deny Plaintiff's requests.

66.     Plaintiff was ultimately found guilty of violating drug use charge 113.24, being under the influence of a controlled substance, and charge number 108.14, violation of Temporary Release Program rules and regulations.

67.     After finding Plaintiff guilty, Defendant Mulligan informed Plaintiff that she would not put him in the Segregated Housing Unit (SHU) due to his good behavior during the duration of his time at Fishkill. Additionally, Defendant Mulligan wrote in the Superintendent Hearing Disposition report that the disposition of Plaintiff's charges "has been mitigated by your excellent institutional record."

68.     As a result of being found guilty of the Tier III drug use charge and for violations of the Temporary Release program rules, Plaintiff was forced to remain under the same disciplinary actions with the same restrictions to visitation and commissary privileges. Plaintiff was unable to

17

buy food from the commissary and had no visitation rights since he was wrongfully disciplined for the inaccurate urine test results prior to the Superintendent Hearing.

69.     Mr. Taylor felt tremendous shame and humiliation for being removed from the Work-Release program and fell into despair.  Mr. Taylor felt that all of the hard work he put in to changing his behavior and transforming his life, was all for naught. He also felt judged by other individuals incarcerated at Fishkill, who ridiculed and accused Plaintiff of wasting an opportunity to have freedom and independence, by getting high, and refused to accept his consistent pronouncements of innocence.

70.     After the Superintendent's Hearing, Plaintiff again requested a second urinalysis be given to him, or alternatively, a blood test.  Plaintiff also requested that his urine be sent to a lab for accurate processing. These requests were denied by Fishkill employees, including, upon information and belief, Defendants Officer Berry, Officer S., Officer Brandon, and Officer Hilton (all first names unknown at this time).

71.     On January 29, 2020, hours after Plaintiff's Superintendent's Hearing, Plaintiff filed a formal appeal to the DOCCS Commissioner challenging both the accuracy of the urine test results and the subsequent violation of Temporary Release Program rules conviction.

72.     On February 26, 2020, Plaintiff also filed an appeal to the Director of the Temporary Release Program based on Fishkill's failure to provide him with adequate due process prior to his removal from the Work Release program, improper revocation of his privileges and the improper procedures to which Plaintiff was subjected. In the appeal, Plaintiff also restated the verbal complaints he expressed to several Fishkill employees and Correction Officers.

73.     The "false positive" drug test result deprived Plaintiff of being able to stay in the Work Release program, continue living at home with his family for five days each week, and maintain his employment working at Wendy's. At that point Plaintiff was seven months into his Work Release where he would spend five nights at home with a scheduled conditional release date of March 12, 2020. However, as a result of the false positive urine test, Plaintiff was wrongfully imprisoned full time, punished for offenses he did not commit, had his "good time"and basic privileges revoked, and terminated from his job at Wendy's where he lost the opportunity to be promoted to a managerial position.

74.     Two and a half months after being wrongfully incarcerated, Plaintiff was summarily released from Fishkill on March 26, 2020. Upon release, no DOCCS personnel, Fishkill Officer, employee or agent ever provided Plaintiff with an explanation as to why Fishkill reversed its position and suddenly released Plaintiff from confinement.

### AS AND FOR COUNT ONE
### 42 U.S.C. § 1983 - DUE PROCESS
### FIFTH AMENDMENT

75.     Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs 1 through 74 with the same force and effect as though set forth fully herein.

76.     The incidents of administration by Defendants BERRY, BRANDON, S., GLOVER, HERNANDEZ, HILTON, ICARRI, MULLIGAN, RUBIO, WU and DOES unlawfully deprived Plaintiff of his right to maintain employment, to maintain and improve his status in society and his liberty to not be in jail. This deprivation of property and liberty interests was done without proper due process due to Defendants knowingly using a faulty uranalysis test, destroying evidence, writing faulty reports, not holding a proper hearing, not listening to Plaintiff's challenges, assigning Plaintiff

a Tier III ticket without justification, unlawfully fully incarcerating Plaintiff, and keeping Plaintiff incarcerated past his original release date. These actions by defendants deprived Plaintiff of his rights, privileges and immunities as guaranteed under the United States Constitution and the New York Constitution, the Civil Rights Acts, 42 U.S.C. §§ 1981, 1983, 1985 and 1988.

77.    The Defendants' actions violated Plaintiff's procedural due process rights by subjecting Plaintiff to disciplinary measures before any hearing occurred, removing him from the work-release program, revoking his visitation and commissary privileges, giving Plaintiff a Tier III ticket before any hearing was held, and before he was able to contest the false positive test or have an opportunity to be heard. Moreover, Plaintiff was not in violation of any rules or regulations imposed on detainees in the care and custody of Fishkill Correctional Facility.

78.    Defendants GLOVER and MULLIGAN unlawfully coerced, intimidated and attempted to pressure Plaintiff to plead guilty to charges which Plaintiff knew he was innocent of. By attempting to pressure Plaintiff to do so, Defendants GLOVER and MULLIGAN were directly prohibiting Plaintiff from his right to due process.

79.    Defendants BERRY, BRANDON, S., HERNANDEZ, HILTON, ICARRI, RUBIO, WU and DOES also contributed in denying Plaintiff's due process rights by not responding to his challenges that his IPUA drug test had been faulty and that he needed a confirmatory second test, as per State of New York regulations and Defendants THERMO FISHER and MICROGENICS' standards.

80.    Additionally, Plaintiff's substantive due process rights were violated because he was wrongfully incarcerated for a longer period of time than his original release date due to Defendants BERRY, BRANDON, S., HERNANDEZ, HILTON, ICARRI, RUBIO, WU and DOES failure to

uphold Plaintiff's due process rights.

81.    Plaintiff's liberty and freedom was unlawfully taken from, without due process, despite the fact that he did not consume any illicit drugs whatsoever.

82.    Due to violations of due process by Defendants, Plaintiff suffered loss of freedom and loss of employment, and suffers severe mental and emotional damages, distress, pain, suffering, loss of self-esteem, self-doubt, and has been exposed to disgrace, embarrassment and was deprived of his constitutional rights and has been damaged in the sum in excess of five million ($5,000,000.00) dollars, including the cost of this action, attorneys fees pursuant to 42 U.S.C. § 1988, and punitive damages.

## AS AND FOR COUNT TWO
### 42 U.S.C. § 1983 - NEGLIGENCE

83.    Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs 1 through 82 with the same force and effect as though set forth fully herein.

84.    Defendants MICROGENICS and THERMO FISHER had a duty in their contract to provide reliable IPUA drug tests for the known purpose of drug testing inmates at DOCCS facilities.

85.    Defendants MICROGENICS and THERMO FISHER breached their duty of reasonable care by providing urinalysis tests to DOCCS that they knew required a second confirmatory test to lessen the margin of error of a false positive result and mitigate the cross-reactivity issue, according to their own standards and practices, and neglecting to inform DOCCS of such requirement.

86.    The faulty IPUA drug tests that Defendants provided were so unreliable that DOCCS ultimately decided to terminate their contract with Defendants for good cause. Not only that, DOCCS

had knowledge before Plaintiff was tested that these drug tests were wholly unreliable because DOCCS completed the termination of their contract (January 2020) within the same month that Plaintiff was tested (January 9, 2020).

87.     As a result of the negligence of Defendants MICROGENICS and THERMO FISHER, Plaintiff was unlawfully incarcerated and punished without an honest basis. Plaintiff suffered severe and permanent personal injuries, pain and suffering, emotional, mental, and psychological distress, anguish, anxiety, fear, humiliation, and embarrassment.

88.     Because of Defendants MICROGENICS and THERMO FISHER's negligence, Plaintiff has suffered pain and suffering, loss of liberty, and monetary damages.

89.     Defendants BERRY, BRANDON, S., GLOVER, HERNANDEZ, HILTON, ICARRI, MULLIGAN, RUBIO, WU and DOES had a duty to responsibly carry out their roles and responsibilities while respecting inmates' rights. Thus, Defendants BERRY, BRANDON, S., GLOVER, HERNANDEZ, HILTON, ICARRI, MULLIGAN, RUBIO, WU and DOES had a responsibility to carry out proper procedures and follow New York regulations when drug testing Plaintiff.

90.     Defendants BERRY, BRANDON, S., GLOVER, HERNANDEZ, HILTON, ICARRI, MULLIGAN, RUBIO, WU and DOES failed to carry out Fishkill Correctional Facility's rules and New York State's regulations when an inmate has a purported "positive" drug test result since a second confirmatory test was not conducted.

91.     Defendants knew or should have known that the IPUA drug test used on Plaintiff would be likely to yield a faulty result and thus at least required a second confirmatory test before incarcerating and penalizing him, and without first holding a timely hearing for Plaintiff to challenge

his result.

92.     Defendants BERRY, BRANDON, S., GLOVER, HERNANDEZ, HILTON, ICARRI, MULLIGAN, RUBIO, WU and DOES did not listen to Plaintiff's challenges during the Superintendent's Hearing or outside of the hearing. Moreover, Defendants GLOVER and MULLIGAN tried to pressure Plaintiff to plead guilty. Also, the Superintendent's Hearing was not held within 14 days of an Inmate Misbehavior Report being issued as required by Fishkill's own policies, and thus was negligently held.

93.     As aforementioned, these deliberately indifferent acts by Defendants BERRY, BRANDON, S., GLOVER, HERNANDEZ, HILTON, ICARRI, MULLIGAN, RUBIO, WU and DOES led to Plaintiff being negligently drug tested and unlawfully punished and incarcerated.

94.     Due to Defendants BERRY, BRANDON, S., GLOVER, HERNANDEZ, HILTON, ICARRI, MULLIGAN, RUBIO, WU and DOES' negligence, Plaintiff suffered loss of employment, freedom, safe housing, privileges and amounted greater mental health issues.

95.      Due to negligence by Defendants, Plaintiff suffered loss of freedom and loss of employment, and suffers severe mental and emotional damages, distress, pain, suffering, loss of self-esteem, self-doubt, and has been exposed to disgrace, embarrassment and was deprived of his constitutional rights and has been damaged in the sum in excess of five million ($5,000,000.00) dollars, including the cost of this action, attorneys fees pursuant to 42 U.S.C. § 1988, and punitive damages.

### AS AND FOR COUNT THREE
### 42 U.S.C. § 1983 - CRUEL AND UNUSUAL PUNISHMENT
### EIGHTH AND FOURTEENTH AMENDMENT

96.     The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 95 of this Complaint with the same force and effect as though fully set forth herein.

97.     As a result of the acts of Defendants, Plaintiff was removed from the safety of his home and the designated section of the prison for inmates who have earned privileges based on good behavior, and unjustly transferred to the more dangerous general population section of the prison.

98.     Defendants BERRY, BRANDON, S., GLOVER, HERNANDEZ, HILTON, ICARRI, MULLIGAN, RUBIO, WU and DOES attempted to use their governmental authority to force, intimidate and pressure Plaintiff when they knew or should have known the uranalysis test to be invalid or subject to scrutiny.

99.     Defendant GLOVER purposefully falsified the report that was relied on to unlawfully incarcerate Plaintiff even though Defendant GLOVER knew or should have known that the uranalysis test relied upon was known to be unreliable and faulty.

100.    Defendants OFFICERS GLOVER and MULLIGAN also intentionally attempted to pressure Plaintiff to plead guilty during his hearing and did not listen to Plaintiff's challenges to his faulty drug test. Defendants GLOVER and MULLIGAN knew or should have known the negative and serious effects that would occur if Plaintiff was removed from the Temporary Work-Release program and transferred to the general population area.

101.    The issuance of the Tier III ticket by Defendant OFFICER DOE to Plaintiff was unjust due to the lack of justification and lack of proper procedure before issuing the ticket.

Defendant OFFICER DOE knew or should have known the negative consequences that would ensue from an inmate in the Temporary Work-Release program being issued such a ticket, and known or should have known that it was not reasonable for him or her to issue a ticket of that level. Infractions of the nature charged against Plaintiff were known to receive a maximum Tier II ticket. Defendant OFFICER DOE knew or should have known that he or she was unreasonably punishing Plaintiff and putting him in substantial risk of serious harm by causing the removal from the Temporary Work-Release Program and transferring him to the more dangerous general population area where he was around other inmates who were not interested in performing good behavior.

102.    Due to the cruel and unusual punishment by Defendants, Plaintiff suffered loss of freedom and loss of employment, and suffers severe mental and emotional damages, distress, pain, suffering, loss of self-esteem, self-doubt, and has been exposed to disgrace, embarrassment and was deprived of his constitutional rights and has been damaged in the sum in excess of five million ($5,000,000.00) dollars, including the cost of this action, attorneys fees pursuant to 42 U.S.C. § 1988, and punitive damages.

### AS AND FOR COUNT FOUR
### 42 U.S.C. § 1983 - FABRICATION OF EVIDENCE

103.    The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 102 of this Complaint with the same force and effect as though fully set forth herein.

104.    Defendants BERRY, BRANDON, S., GLOVER, HERNANDEZ, HILTON, ICARRI, MULLIGAN, RUBIO, WU and DOES knew that there was a possibility that Plaintiff did not take opiates and needed a second confirmatory test, and yet did not provide him one and manipulated the

faulty "positive" result to punish and incarcerate Plaintiff. Although Plaintiff voiced his truth that he did not take an illicit substance and that he wished to be retested, Defendants BERRY, BRANDON, S., GLOVER, HERNANDEZ, HILTON, ICARRI, MULLIGAN, RUBIO, WU and DOES continuously did not listen to Plaintiff and instead proceeded as if Plaintiff was lying. The false report by Defendant GLOVER without further review led to the unjust incarceration of Plaintiff. The pressure Defendant MULLIGAN imposed on Plaintiff to falsely plead guilty is unlawful and irresponsible, especially since the hearing was late and no Lieutenant was present as required.

105.    Defendants BERRY, BRANDON, S., GLOVER, HERNANDEZ, HILTON, ICARRI, MULLIGAN, RUBIO, WU and DOES also failed to give Plaintiff a second confirmatory urinalysis test, failed to address his challenge to his faulty IPUA drug test, or give him any reason as to why he was incarcerated and then suddenly released.

106.    Due to the fabrication of evidence by Defendants, Plaintiff suffered loss of freedom and loss of employment, and suffers severe mental and emotional damages, distress, pain, suffering, loss of self-esteem, self-doubt, and has been exposed to disgrace, embarrassment and was deprived of his constitutional rights and has been damaged in the sum in excess of five million ($5,000,000.00) dollars, including the cost of this action, attorneys fees pursuant to 42 U.S.C. § 1988, and punitive damages.

## PUNITIVE DAMAGES ARE PROPER
## AGAINST THE INDIVIDUAL DEFENDANTS

107.   The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 106 of this Complaint with the same force and effect as though fully set forth herein.

108.   The acts of the individual Defendants were willful, wanton, malicious and oppressive and were motivated solely by a desire to harm Plaintiff, without regard to for Plaintiff's well-being, and were based on a lack of concern and ill-will towards Plaintiff. Such acts therefore deserve an award in excess of ten million ($10,000,000) dollars as punitive damages.

## PRAYER FOR RELIEF

Wherefore, based on the foregoing, Plaintiff requests judgment as follows:

a.   On the Count One in the sum in excess of five million ($5,000,000) dollars as well as punitive damages, costs and attorney's fees;

b.   On the Count Two in the sum in excess of five million ($5,000,000) dollars as well as punitive damages, costs and attorney's fees;

c.   On the Count Three in the sum in excess of five million ($5,000,000) dollars as well as punitive damages, costs and attorney's fees;

d.   On the Count Four in the sum in excess of five million ($5,000,000) dollars as well as punitive damages, costs and attorney's fees;

e.   Punitive damages in the sum in excess of ten million ($10,000,000) dollars;

f.   Award attorney's fees and costs of this action to the Plaintiff pursuant to 42 U.S.C. § 1988; and

g.   Declaratory Judgment that defendants willfully violated Plaintiff's rights secured by federal and state law as alleged herein;

h.   Injunctive relief, requiring Defendants to correct all past violations of federal and state law as alleged herein; to enjoin Defendants from continuing to violate federal

and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws;

i.      Award such other and further relief as this Court may deem appropriate.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Dated: Hempstead, New York
        July 29,  2021

LAW OFFICES OF
FREDERICK K. BREWINGTON

By: _____
FREDERICK K. BREWINGTON
*Attorneys for Plaintiff*
556 Peninsula Boulevard
Hempstead, New York, 11550
(516) 489-6959

28